(Decided July 15th, 1859.)

---

# Negro Ann Hammond *vs.* The State.

A party was indicted as a *free negress*, for obtaining goods under false pretences, under the Act of 1835, ch. 319. She pleaded *non cul.*, and at the

trial it turned out she was a *slave,* and the State's attorney thereupon moved to amend the indictment according to the fact, which was allowed, and the trial proceeded to conviction, and the traverser moved in arrest of judgment. HELD:

1st. That this change in the indictment was as to the *degree* or *condition* of the party charged, and is not covered by the Act of 1852, ch. 176, which only authorises an amendment of the name of the party charged when the misnomer is *pleaded,* and of the names of persons other than the defendant.

2nd. But the matter of the amendment was mere surplusage, not vitiating the indictment, inasmuch as the party might have been, according to the Act of 1852, ch. 63, tried and punished on the indictment to which she pleaded.

The Act of 1852, ch. 63, expressly declares, that no indictment shall be quashed, nor shall any judgment be stayed or reversed, for the omission or misstatement of the *title, occupation* or *degree* of the defendant, nor for the want of the averment of any matter unnecessary to be proved.

*Slaves* are embraced in the terms, and are amenable to the penalties of the Act of 1835, ch. 319, which declares, that if *"any person"* shall obtain by false pretences, any chattel, money or valuable security, with intent, &c., *"every such offender"* shall, at the discretion of the court, be punished by fine and imprisonment, or confinement in the penitentiary.

Hardship upon the master may be assumed in any case where his slave is taken under the law for punishment for the benefit of society, but if compensation is not provided the courts cannot, if jurisdiction be conferred, avert the consequences of such a *casus omissus* by averting punishment.

ERROR to the Circuit Court for Frederick County.

The plaintiff in error was indicted for obtaining goods under false pretences. The indictment described her as a *"free negress,"* and she pleaded *not guilty.* At the trial, after witnesses had been examined on the part of the State and the traverser, the State's attorney moved to amend the indictment by striking out *"free negress"* and inserting *"the negro slave of Philip Hammond."* This motion the counsel for the traverser resisted, but the court (NELSON, J.) ordered the amendment to be made, which was done, and the jury rendered a verdict of *guilty.* The traverser then moved in arrest of judgment, because—

1st. The indictment was mutilated and changed without authority of law, and was not the one found by the grand jury.

2nd. After the jury were charged and all the evidence closed, a material allegation was stricken out of the indictment and another material allegation inserted therein.

3rd. The indictment on which the jury rendered their verdict varies materially from the one they were sworn to try, inasmuch as the latter alleged the traverser to be a "free negress" while the former charges her with being "the negro slave of Philip Hammond."

4th. The penalty for the crime alleged and charged in the original indictment is different from that incurred by the indictment as changed.

5th. By this alteration the traverser has been precluded from demurring to the indictment as changed.

6th. This was not an alteration of the "title, occupation or degree of the defendant," but of a material allegation necessary to be proved.

7th. By this alteration the traverser has been deprived of her right to be informed of the accusation against her, and to have a copy of the indictment in due time to prepare for her defence.

8th. The indictment, as altered, is erroneous and insufficient in law.

9th. The record, proceedings and indictment are erroneous and defective, and no valid and legal judgment can be rendered thereon.

10th. The indictment preferred by the grand-jury allowed the traverser the right to challenge, whereas that on which the jury found their verdict entitled her to a list of twenty jurors, with the right to strike four therefrom, of which latter right she has been deprived by this alteration.

The court overruled this motion, imposed a fine of $10 and costs, and adjudged her to be imprisoned ninety days in the county jail, and to correct this judgment the present writ of error was sued out by the traverser.

The cause was argued before LE GRAND, C. J., TUCK and BARTOL, J.

18      v. 14.

Negro Ann Hammond *vs.* The State.

*Bradley T. Johnson* for the plaintiff in error.

The traverser has been indicted and tried as a *free negress,* convicted as a *slave,* and sentenced and punished as a *free negress.* The indictment found by the grand-jury, and which the petit-jury were sworn to try, under the Act of 1835, ch. 319, described an offence unknown to the common law. The indictment, as *altered,* charges acts which are not criminal, for a *slave* cannot be punished under the Act of 1835. *Persons* are always distinguished, under the criminal law of Maryland, from *slaves.* The Act of 1723, ch. 15, punishes *"slaves"* for striking white *"persons;"* that of 1821, ch. 240, changes their punishment to whipping. By the Act of 1827, ch. 15, *slaves* enticing other slaves to abscond are to be whipped; *persons* doing so are to be confined in the penitentiary. The Act of 1849, ch. 296, punishes *persons* in one way and *slaves* in another. The Act of 1844, ch. 80, punishes *persons* only as does that of 1837, ch. 361. The Act of 1793, ch. 57, in secs. 10, 11, 12, 13, marks the distinction between *persons* and *slaves.* The Act of 1835 declares, that *"if any person* shall procure," &c.; such person could not be a slave, for sec. 2 enacts, that a *promise of future payment* shall not be a false pretence. Now, a slave can make no *promise,* which, in the clear meaning of the Act, is a *contract;* and sec. 3 gives power to the court to order restitution of goods fraudulently obtained, and the Act of 1809, ch. 138, sec. 23, provides, that if restitution is not immediately made when ordered, execution shall issue against the *property* of the *convicted person.* A slave can have no property.

But if the Act of 1835 does apply to, and include, slaves, within its prohibitions, the punishment to be inflicted on slaves must be applied under the general law punishing slaves. The Act of 1818, ch. 197, declares, that in all cases where slaves are convicted of crimes for which the punishment is not hanging, such slaves shall be banished and sold or whipped. It prohibits the sending of a slave to the penitentiary. The law is general, operating on crimes then existing, and on all which should be thereafter created. It is the declaration of the policy of the law of Maryland, that punishment shall fall

on the guilty, the *slave,* not on the innocent party, the *master,* and in all cases provision has been made for compensation to the master from loss by reason of the conviction of his slave. The Acts of 1793, ch. 57, 1802, ch. 92, 1809, ch. 138, sec. 21, 1818, ch. 197, 1845, ch. 340, and 1849, ch. 124, all provide, that the master shall be paid. If this sentence of fine and imprisonment is legal, a slave may be imprisoned for life in the county jail, and fined ten times his value, to the total loss of his owner. But this judgment is absurd—that a *slave* shall pay a fine when a slave cannot possibly hold any property—and its absurdity proves that slaves are not to be punished, under the Act of 1835, by fine and imprisonment. The Acts of 1845, ch. 340, and 1849, ch. 124, clearly show, that they are not to be imprisoned in the penitentiary. It is therefore insisted: 1st, that the facts charged in the indictment constitute a crime only by virtue of the Act of 1835; 2nd, that this indictment, on which this traverser has been convicted, charges her as a *slave;* 3rd, that the Act of 1835 does not apply to *slaves;* 4th, that if it does, as a *slave,* she must be punished under the Act of 1818; 5th, the conviction being as a *slave,* and the sentence as a *free woman,* the *judgment* is erroneous and must be reversed; and lastly, if this is not considered as an indictment under the Act of 1835, but as alleging a common law misdemeanor, that even then no such judgment as this can be entered against a *slave,* and it is therefore erroneous.

The judgment ought however to have been arrested on the motion in arrest, because the indictment was altered and mutilated in material parts and allegations. No authorities need be adduced to prove that an indictment cannot be amended at common law, it being the finding of a grand-jury on their oaths. This alteration, therefore, must be, by virtue of the Act of 1852, ch. 176, which, as to its first section, is a transcript of 9 Geo., 4, ch. 64, sec. 19, and its second, in substance, being derived from 14 & 15 Victoria, ch. 100, sec. 1. That Act only authorises amendments in cases of *misnomer,* as declared by its title. When a misnomer of the defendant is *plead in abatement,* then his correct name and addition may

be inserted, and when, on trial, the name of any person other than the defendant appears to be erroneously stated, that may be corrected. Here there was no *misnomer* of the defendant, no *plea in abatement*, and no incorrect statement of the name of any person other than the defendant. The Act, therefore, does not authorise the alteration. Again, the allegation that the traverser was a *free negress*, or that she was a *slave*, was not a *descriptio personæ*, or the addition of her *degree*. It was a material allegation necessary to be made, in order that the court might direct the *mode of trial* and award the *proper punishment*. Whenever an allegation in an indictment affects the judgment and sentence of the court, it is a material one, and must be made. 10 *G. & J.*, 374, *Root vs. The State.* I have shown that the judgment to be passed on a *free negress* is different from that which the court must enter against a *slave*. The universal and long established law of Maryland has been, that when a party charged with crime is alleged to be a *free negro*, the court will regard, as a fatal variance, absence of proof of the fact of freedom, the legal presumption then being that he is a slave. This arises from the differences which I have before shown to exist between the punishment of free-men and slaves. The mode of trial depends upon these allegations. By the Act of 1841, ch. 162, whenever a crime can be punished by confinement in the penitentiary, the party charged has the right to twenty peremptory challenges. By the Act of 1809, ch. 138, sec. 14, all trials for offences not penitentiary must be by a special panel of twenty, of whom each side has the right to strike four. Now, if the traverser had been a free negress, being liable, under the Act of 1835, to punishment by confinement in the penitentiary, she must have been tried by one kind of jury; if she were a slave, being liable to a different punishment under the Act of 1818, ch. 197, she ought to have been tried by a different kind of jury. In point of fact, as shown by the record, she was tried by a challenged jury, when, under the indictment upon which she was convicted, she was entitled to a different mode of trial. The grand-jury have made and the traverser has plead to a charge to be tried in one way and punished in a certain mode,

and after jury sworn, and evidence all in, the court and State's attorney have altered it and convicted her of a charge which ought to have been tried differently, and which subjected her to a different punishment. The Act of 1852, ch. 176, sec. 1, authorises amendments of the misnomer of defendants only on pleas in abatement. There is no such plea here, and the amendment being unauthorised is illegal. There was a plea of *"not guilty,"* which cures all defects that a plea in abatement would reach. And all such defects having been thus cured, it is assuredly error to alter that which is right already. Now can any authority for it be found in an Act which provides, "that whenever it shall appear, after jury sworn on any indictment, that the *name* of any person other than the defendant has been erroneously set forth in the indictment," then such indictment may be amended according to the proof? This evidently provides for the misapplication of a name to an individual referred to in the charge. When the *right* person is called by the *wrong* name such mistake may be corrected, but it cannot apply to cases where a person is erroneously specified. It cannot be held to intend that the court shall have the right to alter an indictment by making it refer to a different individual than the one stated therein, and inserting the proper name of that different individual. The Act only applies to those cases where it clearly appears that there has been a misapplication of a name to a person, and not where there is an incorrect allegation of a connection of certain facts and a certain person: as where the charge is that the prisoner murdered *Smith* and the proof shows that he had murdered *Jones,* who has been misnamed *Smith,* then an amendment may be made, but if the proof shows that both *Smith* and *Jones* have been murdered, the State's attorney would not be allowed to select which crime *he* would hold the party on trial for, by *amending* the indictment by motion. It is therefore insisted, that this judgment ought to have been arrested, there having been error in the amendment of the indictment, 1st, because no amendment is authorised at common law; 2nd, because the Act of 1852, ch. 176, does not authorise it, it not being a correction of a *misnomer;* 3rd, because the allegations, *free*

*negress* and *negro slave* are material, necessary allegations in this indictment, the mode of trial and manner of punishment being controlled by them.

But it may be argued, that the judgment could not have been arrested on account of this alteration, because the Act of 1852, ch. 63, declares, that no judgment shall be stayed for any cause which might have been subject of demurrer; that under the Act of 1852, ch. 176, after the alteration was made the jury might have been discharged, a continuance procured, the plea of not guilty withdrawn, and the demurrer put in, and therefore the party having failed to demur cannot now ask for an arrest of judgment. According to my construction of the Act of 1852, ch. 176, this alteration is not authorised by it, and the Act not applying to this case, no such proceedings could be had as continuance, withdrawal of the plea, &c., all of which can take place only by virtue of that Act. If it does apply, however, after the jury is sworn they can only be discharged on oath of the party under that Act of Assembly. The *oath* is the foundation of his right, the beginning of the process by which it is suggested that he can demur. But the case may frequently happen where he cannot make the affidavit prescribed by the law, to wit, that such alteration has informed him of a fact before unknown to him, for the fact may have been well known, or that he cannot proceed with his trial without injury to himself, because the proceeding therewith may do him no more injury then than ever thereafter. If the Act of 1852, ch. 176, does not apply, he cannot demur; if it does apply, he not being able to make the oath as required by it, is deprived of his demurrer, and it surely is a mockery of right for the law to say, "if you do not demur you shall be punished," and at the same time provide a mode by which the accused is deprived of the demurrer. It is equivalent to saying that you shall be punished either legally or illegally. Further, the Act of 1852, ch. 63, was only intended to drive parties to demurrer as to pre-existing irregularities, all of which were intended to be cured by the plea of *not guilty* when they had existed on the record *previous* to the plea, and can, of course, have no effect on an alteration

of the record made *after* plea pleaded and the time for demur-
rer had passed. The words of the Act, it may be observed,
are very sweeping, "that no judgment shall be stayed for any
thing which would have been cause for demurrer," but I am
at a loss to imagine what judgment a court could pass when
the indictment charged as an offence that which is no offence,
and which no law, common, statute or moral, denounces or
punishes. Such a charge would undoubtedly be demurrable,
yet if not demurred to, judgment, says the Act, shall not be
stayed. Certainly judgment shall not be entered when no
judgment can, in the reason of things, be passed. If a wo-
man was convicted on an indictment which charged her with
witchcraft, what judgment could be entered? Would it be
under 33 *Hen.*, 8, *ch.* 8? for a woman has been executed in
Maryland for this offence. *Kilty's Rep. of Stat.*, 190. Or
if a man was indicted for "celebrating and saying one mass,"
and neglecting to demur, was convicted and sentenced under
33 *Eliz.*, *ch.* 1, *sec.* 4, and then brought his writ of error,
could such a judgment be affirmed because he had not demur-
red? The Act of 1852, ch. 63, then, can only be intended to
have cured, by plea, such *formal* irregularities and causes for
demurrer as come within Sir Matthew Hale's denunciation of
the "unbecoming niceties and technicalities of the law which
have become a reproach to its administration, whereby many
offenders escape, and which is more their shield and protec-
tion than their terror," and does not apply to any substantial
defect in the indictment, nor to any error in the record, occur-
ring after plea.

Even if the Act of 1852, ch. 176, is held to authorise this
amendment, it is illegal and void, being unconstitutional. The
statutes of 9 *Geo.*, 4 *ch.* 64, and 14 & 15 *Victoria, ch.* 100,
cannot be objected to in England, because they interfered with
any right of the party on trial; those rights being themselves
mainly secured by Acts of Parliament, which are repealable.
There is no limit there to the legislative power. But in Mary-
land the Constitution defines certain rights of the citizen, and
all legislative acts, treading upon them, are unconstitutional
and void. The Act of 1852, ch. 176, is contrary to the Bill

of Rights, sec. 19, which secures to the party accused, the right to be informed of the charge against him, and have a copy of the indictment. These are substantial rights, useful and precious to the citizen. They are secured to him, in order that he may have time to prepare for his defence, and he is to know the charge, and have a copy, *before* the trial, else they are mockeries. With the right to have counsel, they have been won from the reluctant hands of the common law in England, secured by repealable statute, in Maryland guarantied by irrepealable constitutional compact. The Act of 1852, ch. 176, utterly destroys these rights, for, under it, a party is furnished with a copy of *one* indictment, pleads to it, and after the jury is sworn, and the case gone into, a new and different indictment is made by amendment, upon which he is convicted. The grand jury, on their oaths, according to the course of the common law, charge him with one crime, and the court and State's attorney contradict them and charge him with another. Which is the indictment on which he is tried? Which one can he plead in bar to a subsequent prosecution? The one found by the grand jury, to which he has plead and which the petit jury are sworn to try, or the one made by the court on which they have found their verdict? Certainty in an indictment is necessary to protect the party from a subsequent protection, says this court in *State vs. Nutwell*, 1 *Gill*, 54. What certainty is there when it first charges one crime and then another? The Act of 1852, ch. 176, sec. 1, allows a new indictment to be found *instanter*, on the mere motion of the State's attorney, which must be tried. The second section goes still further, and authorises the original to be *withdrawn* and a new one submitted to the jury, after they are sworn on the first. I have already shown how a continuance cannot be procured in many cases by the oath of the party, after amendment, as provided by that section, because of the inability of the party to make such oath as is required, and his trial *must* therefore proceed at once. His right to be informed of the charge against him and to have a copy of the indictment are thus utterly abrogated and destroyed. An indictment for murdering *Smith*, charges a different offence than

the murder of *Jones,* yet the construction, contended for, allows a party to be placed upon trial for the first, and to be convicted of the second. Or if such an alteration, as is made here, is tolerated, a citizen may be placed upon trial for a misdemeanor, and the indictment altered to charge a capital felony, on which he may be convicted. The Act of 1852, ch. 176, must therefore be unconstitutional.

*John A. Lynch,* State's Attorney for Frederick County, for the State.

The traverser was indicted under the Act of 1835, ch. 319, sec. 1, which declares, "That if any person shall, by any false pretence, obtain from any other person, any chattel, money or valuable security, with intent," &c., "every such offender shall be guilty of a misdemeanor, and being convicted thereof," &c., "shall be liable, at the discretion of the court, to be punished by fine and imprisonment, or by confinement in the penitentiary," &c. Now this Act is very general in its terms, and *any person,* that is, slave or free, may be indicted under it, and, if found guilty, may be sent to the penitentiary, in the court's discretion; therefore we say, the allegation of *"free negress,"* or *"negro slave of Philip Hammond,"* is immaterial, because the punishment, in either case, is the same, and the manner and course of proceeding in the trial of the case would be the same, whether the party be indicted as a slave or free negress.

The Act of 1852, ch. 63, sec. 2, says, "No judgment shall be stayed or reversed for the omission or misstatement of the title, occupation or degree of the defendant;" hence, we say this party could have been tried and convicted, without alleging in the indictment that she was free or slave, it being the degree of the traverser and could have been omitted; therefore the addition of *"free negress,"* or *"negro slave,"* is mere surplusage and immaterial. The Act of 1845, ch. 340, prescribing the punishment for certain offences committed by negro slaves, does not include the crime of false pretences, it cannot therefore affect this case. And the Act of 1818, ch.

19    v. 14.

197, in regard to the punishment of slaves is, in effect, re-pealed by the Act of 1835, ch. 319, so far as the crime of false pretences is concerned.

The rights and privileges of the traverser, under the original indictment, were the same as those under the indictment, as amended, and she was deprived of no one of them by such amendment. The right of peremptory challenge is allowed to any person tried on an indictment for any crime or misde-meanor, the punishment whereof, by law, is confinement in the penitentiary. Act of 1841, ch. 162. And this right ex-ists, whether the prisoner be a slave or free negro, hence the amendment allowed did not affect the right in this respect.

The words, "free negress," or "negro slave," being, as we have shown, unnecessary and mere surplusage, could have been stricken out, ( *Wharton's Crim. Law*, 287,) and the in-dictment would have been a good one; then, we think, the insertion of immaterial words by the court could, in no way, vitiate the indictment. If, after the amendment, the prisoner had thought her rights were prejudiced, she could, by making affidavit to that fact, have had the jury discharged and the trial of the case postponed to a reasonable time. Act of 1852, ch. 176, sec. 2. Then, under the decision in *Cochrane vs. The State*, 6 *Md. Rep.*, 400, she could have withdrawn the plea of "*Not guilty*," and demurred to the indictment and taken advantage of all errors, if any there were. But failing to do so, the motion in arrest could not be allowed, because the Act of 1852, ch. 63, sec. 2, declares, that no judgment shall be stayed, &c., "for any matter or cause which might have been a subject of demurrer to the indictment." See also *State vs. Reed*, 12 *Md. Rep.*, 263. And under this Act and the de-cision in the case of *Wedge vs. The State*, 12 *Md. Rep.*, 232, "A judgment cannot be stayed or reversed for any mere imper-fection in matters of form, which do not tend to the prejudice of the defendant." The amendment in this case, as we have shown, being such "mere matter of form" as is contemplated in the Act just mentioned, and not capable of working any prejudice to the defendant, the court very properly refused to arrest the judgment.

The Act of 1852, ch. 176, is certainly not unconstitutional, because it is not in conflict with any provision of the Constitution or Bill of Rights, and deprives the citizen of no rights under that instrument. It is said, the prisoner, when the indictment, is amended, changed or altered at the trial is deprived of the constitutional right "to be informed of the accusation against him," and "to have a copy of the indictment or charge in due time, (if required,) to prepare for his defence." But this same Act, which allows the amendment to be made, also provides, that if the party thinks his rights "prejudiced," the case may be continued and the prisoner may have reasonable time "to prepare for his defence," and avail himself of every right and privilege given under the Constitution and Bill of Rights. But if the prisoner, after the indictment has been amended, willingly suffers his rights and privileges to be prejudiced and taken from him, without asking for a continuance of the case, as given by the Act, and allows the trial to proceed without objection, it is too late after the trial is over for him to complain.

Tuck, J., delivered the opinion of this court.

The plaintiff in error was described in the indictment as a free negress; at the trial, on the plea of not guilty, it appeared that she was a slave; whereupon the State's attorney moved the court for leave to amend the indictment according to the fact, which was allowed. The trial proceeded to conviction, when a motion was entered in arrest of judgment and overruled.

The case has been fully presented by the arguments filed, but we have discovered no reason for disturbing the judgment.

The Act of 1852, ch. 176, has no application. The first section authorises amendment of the name of the party charged where the misnomer is relied on by way of plea in abatement, which was not the line of defence taken here; and the second provides for such amendment in respect to the names of persons other than the defendant. Here the change in the indictment was as to the degree or condition of the party charged.

We think, however, that the amendment was unnecessary,

and that the party might have been tried and punished on the indictment to which she pleaded, according to the Act of 1852, ch. 63.   The matter of the amendment was mere surplusage, not vitiating the indictment.   The Act referred to expressly declares, that no indictment shall be quashed, nor shall any judgment be stayed or reversed for the omission or misstatement of the title, occupation or degree of the defendant, nor for the want of the averment of any matter unnecessary to be proved.   This party was on trial upon an indictment calling her a free negress.   Suppose she had been convicted without any amendment, could she have taken advantage of the mistake in her degree or condition?   Surely not, the law is expressly to the contrary.

But the argument is, that the change presented an indictment showing that the party was not liable under the law.   If this be well predicated it follows that the proceeding was erroneous. Upon carefully considering the question we think this view cannot be sustained.   The Act of 1835, ch. 319, does not exclude slaves.   The general terms employed embrace them as amenable to its penalties.   It is not pretended that one of this class cannot commit acts which, if done by free persons, would be an offence under the law, but it is supposed that the word "persons" is a discriminating term, and excludes them.   Several examples were furnished from other Acts of Assembly, but they do not sustain the argument.   And if they did supply a reason for the construction now suggested, how should this court decide, in view of the fact that punishments have been inflicted on slaves, on the authority of other laws, where the word "persons" is used, and especially the Act of 1809, ch. 138?   If that word does not include this class, many judicial murders have been committed in this State.   The same word is used in both, and there is no reason, in our opinion, why it should not receive the same application.

The policy of the State, as to the mode of punishing free negroes and slaves, was adverted to, but we do not think this can affect the case.   In 1818 the Legislature declared that slaves should not be sent to the penitentiary, but laws have since been passed awarding that punishment in particular

cases.    Why may we not impute to the Legislature a design to depart from that policy in cases within the Act of 1835, when we see that the words are comprehensive enough to allow that construction?

It is not necessary to show, for the vindication of the judgment below, that certain consequences will not result, for with these judicial tribunals have little to do.    When they see what the law enjoins they have no alternative but to declare accordingly.—*Dicere non dare leges.*    If laws are passed which appear to be unreasonable, or may lead to harsh and inconvenient judgments, as this is supposed to be, the evil must be corrected elsewhere.    Hardship upon the master may be assumed in any case where his slave is taken under the law for punishment, for the benefit of society; but if compensation is not provided, it does not become the courts to avert the consequences of such a *casus omissus*, by arresting punishment if jurisdiction be conferred.

*Judgment affirmed.*

(Decided July 15th, 1859.)

Since the above opinion was prepared the court has been furnished with the following opinion of TANEY, Ch. J., which is directed to be appended to the report of this case, as well on account of its importance, as because it sustains the views here presented:

THE CASE OF THE SLAVE, AMY, CHARGED WITH ROBBING THE U. S. MAIL.    Chief Justice Taney, of the U. S. Supreme Court, rendered his decision in this matter to the following effect:

"The prisoner (Amy) in this case, was indicted for stealing a letter from the Post-office, containing articles of value.    It appeared in evidence in the trial, that she was, at the time the offence was committed, and at the time of trial, a slave, and her counsel therefore prayed the direction of the court to the jury, that the prisoner was not embraced in the description of persons, to which the law in question applied, and upon whom it intends to inflict punishment.

"The motion was over-ruled by the court, and the prisoner, under its direction, was found guilty by the jury, as charged in the indictment.

"And a motion is now made to set aside the verdict and grant a new trial, upon the ground that the instruction asked for ought to have been given, and that the court erred in refusing it.

"The Act of March 3d, 1825, section 22, under which the prisoner is indicted, provides, that if any person shall steal a letter from the mail, the offender shall, upon conviction, be imprisoned not less than two, nor more than ten years.

"It has been argued, in support of the motion, that a slave, in the eye of the law, is regarded as property. And, as the Act of Congress speaks only of *persons,* without any reference to the property of the master, and makes no provision to compensate him for its loss, it was not intended and does not operate upon slaves.

"It is true, that a slave is the property of the master, and his right of property is recognised and secured by the Constitution and laws of the United States. And it is equally true, that he is not a citizen, and would not be embraced in a law operating only on that class of persons. Yet, he is a person, and is always spoken of as such, in the State papers and Acts of the United States.

"Thus, the two clauses in the Constitution which point particularly to property in slaves and sanction its acquisition and provide for its protection, both speak of them as persons, without any other or further description. The clause which authorises the importation of negroes, denominates them persons, and the clause intended to protect that right of property in the master provides, "That no person held to service in one State, under the laws thereof, escaping into another, shall in consequence of any law therein, be discharged from such service, but shall be delivered up," &c. Also, the 3rd clause of the 1st article, which apportions the representation in Congress, describes slaves as persons.

"It is evident therefore that the word person is used in the Constitution to describe slaves as well as freemen. And a court of justice would not be justified in refusing to give the same word the same construction, when used in an Act of Congress, unless there was something in the object and policy of the law, or in the provisions with which the word is associated, which manifestly indicated that it was used in a different sense, and intended to be confined to persons who are free.

"There is certainly nothing in the object and policy of the law in question, from which it can be inferred, that slaves were not intended to be punished for the offences therein enumerated.

"The offences were as likely to be committed by slaves as by freemen, and the mischief is equally great, whether committed by the one or the other. And if a slave is not within the law, it would be in the power of the evil disposed to train and tutor him for these depredations on the mails and post offices, and as the slave could not be a witness, the culprit, who was the real instigator of the crime, would not be brought to punishment. And if the slave himself is not within the law, the crime might be committed daily and with perfect impunity, and all of the safeguards which Congress intended to provide for the protection of its mails, would be of no value. Such a construction would defeat the whole object of the law, and would rather tempt to the commission of these offences, by the certainty of impunity, than to prevent them by the fear of punishment.

"In expounding the law, we must not lose sight of the two-fold character which belongs to the slave. He is a *person* and also *property.* As property, the rights of the owner are *entitled* to the protection of the law. As a person, he is bound to obey the law, and may, like other persons, be punished if he offends against it, and may be embraced in the provisions of the law, either by the description of property, or as a person, according to the subject-matter upon which the State is legislating.

"It is true, that some of the offences created by this Act of Congress, subjects the party to both fine and imprisonment. And it is evident, that the incapacity and disabilities of a slave were not in the mind of Congress when it inflicted a pecuniary punishment. For he can have no property, and is incapable of making a contract, and could not borrow the amount of the fine; and a small fine, which would be but a slight punishment to another, would, in effect, in his case, be imprisonment for life, if the court adopted the usual course, of committing the party until the fine was paid. And, we think, it must be admitted, that, in imposing these pecuniary pen-

Negro Ann Hammond *vs.* The State.

alties, Congress could not have intended to embrace persons who were slaves, and we greatly doubt, whether a court of justice could lawfully imprison a party for not doing an act which, by the law of his condition, it was impossible for him to perform. And to imprison him to compel the master to pay the fine, would be equally objectionable, as that would be punishing an innocent man for the crime of another.

"The case before us, however, does not involve this question; and we must not be understood as expressing a decided opinion upon it. The offence, of which the prisoner has been found guilty, is punished by the law by imprisonment only; and that punishment is, without doubt, looked to, with as much apprehension and fear, and felt as severely by the slave, as it is by the freeman.

"But, although the difficulty above mentioned will arise in passing the sentence of the law, where both fine and imprisonment are imposed, yet that circumstance will not justify the court in departing from the sense and meaning in which the word *persons* is used in the Constitution; especially when it is obvious, that the whole object and purpose of this Act of Congress would be defeated, if the word *person*, as used in it, was held, not to embrace a person who was a slave.

"Nor do we doubt the authority of Congress to pass this law. It is true that no compensation is provided for the master, for the loss of service during the period of imprisonment. But the clause in the 5th amendment of the Constitution, which declares, that private property shall not be taken for public use, without just compensation, cannot, upon any fair interpretation, apply to the case of a slave, who is punished in his own person for an offence committed by him, although the punishment may incidentally affect the property of another to whom he belongs. The clause obviously applies to cases where private property is taken to be used as property for the benefit of the government, and not to cases where crimes are punished by law. And if, in one of those contingencies, which sometimes arise in time of war, a slave is pressed, by the proper authority, into the public service, in order to be employed as a laborer or teamster, or in any other manner, this clause of the Constitution undoubtedly makes it the duty of Congress to compensate the master for the loss he sustains. In such cases, and in all other cases where the slave is taken and used as property, for the benefit of the government, the government acts directly and exclusively upon the master's right of property; without any reference to the personal right or personal duties of the slave towards the government. It deals with him as property only, and not as a person, and as it takes property to be used for the public emolument it must pay for it.

"But punishment for crime stands upon very different principles. A person, whether free or slave, is not taken for public use, when he is punished for an offence against the law. The public, in such cases, acts in self-defence to preserve its own existence and protect its members in their rights of person and rights of property. And the loss which the master sustains in his property is incidental, and necessarily arises from its twofold character; since the slave, as a person, may commit offences, which society have a right to punish for its own safety, although the punishment may render the property of the master of little or no value. But this hazard is invariably and inseparably associated with this description of property; and it can furnish no reason, why a slave, like any other person, should not be punished by the United States for offences against its laws, passed within the scope of its delegated authority.

"It is not for the court to say, whether the government is, or is not, bound, in justice, to compensate the master for the loss of service, during the time the slave shall be imprisoned. The question does not depend upon any provision in the Constitution, nor has it been provided for by any Act of Congress; and, as the matter now stands, it is a question for the decision of the political department of the government, and not for the judicial; and, consequently, is one upon which this court forbears to express an opinion. It would seem, from the statement in the argument at the

bar, that, in different slaveholding States, different opinions upon the subject have been adopted and acted on by the constituted authorities.

"In maintaining the power of the United States to pass this law, it is, moreover, proper to say, that as these letters, with the money within them, were stolen in Virginia, the party might undoubtedly have been punished in the State tribunals, according to the laws of the State, without any reference to the Post Office or the Act of Congress, because, from the nature of our government, the same act may be an offence against the laws of the United States, and also of a State, and be punishable in both. This was considered and decided in the Supreme Court of the United States, in the cases of *Fox vs. The State of Ohio*, 5 *Howard*, 433, and in the case of the *United States vs. Peter Marigold*, 9 *Howard*, 560; and the punishment in one sovereignty is no bar to his punishment in the other.

"Yet in all civilized countries it is recognized as a fundamental principle of justice, that a man ought not to be punished twice for the same offence. And if this party had been punished for the larceny by a State tribunal, the court would have felt it to be its duty to suspend sentence, and to represent the facts to the President, to give him an opportunity of ordering a *nolle prosequi*, or granting a pardon. But there does not appear to have been any proceeding in the State tribunals, or under the State laws, to punish the offence. And as the prisoner has been proceeded against according to the laws of the United States, and found guilty by a jury, selected and empanneled according to the Act of Congress, we see no ground for setting aside the verdict or suspending the sentence.

"*And the motion is therefore overruled.*"